UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELIZABETH MICHELLE ANGELL, and
BRETT ANGELL, her husband,

      Plaintiffs,

v.                    Case No: 3:18-cv-00282-MMH-JBT

ALLERGAN SALES, LLC,
a foreign limited liability company,

      Defendant.

_____/

## AMENDED COMPLAINT

The Plaintiffs, **ELIZABETH MICHELLE ANGELL** and **BRETT ANGELL, her husband,** sue the Defendants, **ALLERGAN, INC., a foreign corporation, ALLERGAN SALES, LLC, a foreign limited liability company,** and **ALLERGAN USA, INC., a foreign corporation,** and allege the following:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $15,000, exclusive of attorney's fees, costs, and interest.

2.     All conditions precedent to the filing of this action have been performed or have occurred.

3.     At all times material hereto, the Plaintiffs, **ELIZABETH MICHELLE ANGELL** (formerly known as Elizabeth M. Anderson; hereinafter "Ms. Angell") and **BRETT ANGELL** (hereinafter "Mr. Angell"), were and are residents of, and permanently domiciled in, the State of Florida.

4.     All medical care and treatment rendered to **ELIZABETH MICHELLE**

**ANGELL** upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

5.     The Defendant **ALLERGAN SALES, LLC** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.     The Defendant **ALLERGAN SALES, LLC** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.     The Defendant **ALLERGAN SALES, LLC** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.     The Defendant **ALLERGAN SALES, LLC**, is hereinafter collectively referred to as "Allergan."

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

9.     In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants.  In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

10.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants.  In 1974 he founded McGhan Medical Corp., which began marketing silicone

2

filled breast implants in 1975.

11.     In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed.  The new company's breast implants were still labeled McGhan breast implants.  By this time the company was one of the largest breast implant manufacturers in the world.

12.     As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

13.     After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

14.     In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled.  Inamed contributed approximately $32,000,000 toward the settlement.

15.     In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.[1]

16.     On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant."  On May 10, 2000, the FDA issued a letter approving the PMA.

17.     In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox,

---

[1]     McGhan is currently serving the remainder of a 10-year prison sentence in Texas for wire fraud in relation to a scheme in which he attempted to use real estate investors' money for another breast implant business.

the injectable wrinkle treatment.   Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

18.     On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

19.     On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants.   The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

20.     In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

21.     With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty."   According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

22.     Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100

4

until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[2], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

### Loren Z. and Mark A. Clayman

23.     Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975. On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida. On October 2, 1978, he filed articles of incorporation for Clayman PA, with himself listed as both President and the Registered Agent of the new corporation.

24.     Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice. During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

25.     After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[3]

26.     By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan). The majority (if not all) of saline filled breast implants he purchased from Inamed/McGhan were Natrelle saline filled breast implants.

---

[2]     At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.
[3]     Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

27.     Before Ms. Angell first consulted with Loren Z. Clayman regarding breast augmentation in 2008, he began making a higher than average number of warranty claims for patients with saline filled implants.  In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or himself.  Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients.  This practice of Loren Z. Clayman and/or Clayman PA continued during the course of treatment of Ms. Angell.

28.     Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

29.     After June 30, 2008, Loren Z. Clayman's son, Mark Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures. For patients who received saline filled breast implants, Mark Clayman through Clayman PA also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him.  Likewise, in many instances, Mark Clayman through Clayman PA made multiple, successive warranty claims for patients, and he rarely, if ever, used silicone filled implants for breast augmentation procedures.

30.     **Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,516 pairs of Natrelle saline filled breast implants.**

31.     According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

32.     Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants.  In accordance with these requirements, Allergan performs a "*Laboratory Analysis*" of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained.  For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

33.     Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

## ELIZABETH MICHELLE ANGELL

34.     Ms. Elizabeth Michelle Angell initially sought a consultation for breast augmentation from Loren Z. Clayman's office on June 12, 2008.  The patient questionnaire form indicated that Ms. Burrell was concerned with her breasts being, "not like they use to be, saggy, lots of stretch marks."  Her specific goal was to increase the size to a "full C" cup.  Ms. Angell was told by Loren Z. Clayman that there would not be a problem providing her with the results she desired. The only note from the visit states, "New patient consultation for augmentation mammoplasty – areola, will call back to schedule."  A surgery cost estimate form indicated a proposal to perform Augmentation Mammoplasty areola for $3,000, plus an operating room charge of $750.00.

35.     There no other details of the initial visit given.  Specifically, there is no record of a discussion with her regarding her objectives, the possible alternatives, and counseling with regard to her condition.  The medical records also fail to document any detailed description of her current complaints, her desired goal, her family history, her past medical history, her past

7

surgical history, or the medications she was taking.  There is also no documented physical examination including dimensional assessment of Ms. Burrell's breasts, nor is there a discussion of possible approaches, type or size of implants to be used, or how he intended to address her concerns.

36.   Unbeknownst to Ms. Burrell, Loren Z. Clayman and Clayman PA had a specific financial incentive to push saline implants on their patients, including Ms. Angell, even when the patient specifically expressed a desire for silicone implants or was a candidate for silicone implants.  Loren Z. Clayman, and Clayman PA had engaged in a scheme with Allergan, the manufacturer of the saline implants, that they could claim a defect in the saline implants and replace them for their direct financial benefit when no such defect existed.  Moreover, Loren Clayman would claim defect of the saline implants and replace them in order to cover up his inadequate surgical skills or haste in performing surgeries on his patients.

37.   Ms. Angell did not schedule surgery at that time but returned for a second consultation for breast implants on May 13, 2010.  She also wanted to discuss liposuction.  There is no further patient questionnaire and no recordation of Ms. Angell's subjective goals or desires.

38.   The only note for the visit of May 13, 2010 indicates, "consultation for augmentation mammoplasty-areola and liposuction of abdomen. SCH. 10/6/10."  There are no other details of the initial visit given.  Specifically, there is no record of a discussion with her regarding her objectives, the possible alternatives, and counseling with regard to her condition. The medical records also fail to document any detailed description of her current complaints, her desired goal, her family history, her past medical history, her past surgical history, or the medications she was taking.  There is also no documented physical examination including

dimensional assessment of Ms. Angell's breasts, nor is there a discussion of possible approaches, type or size of implants to be used, or how he intended to address her concerns.

39.     Ms. Angell returned to Loren Z. Clayman's office for surgery on October 6, 2010. There is no documented physical examination prior to the surgery, specifically, no documented dimensional assessment of Ms. Angell's breasts nor any physical findings whatsoever.   The History and Physical form in Loren Z. Clayman's chart contains only one mark that purports to be that of Loren Z. Clayman, a single arrow in the "normal" column of the list of systems.

40.     The only indication regarding the patient's concerns and goals were the patient's notes that indicate that she was currently a size 34 B and wished to be a size, "full C." She also indicated that her breasts sagged a little bit.   There is no detailed description of her goals or the objectives for the surgery.

41.     There is no indication in Loren Z. Clayman's chart that her subjective concerns or goals were discussed with the patient prior to surgery.   In fact, there is no indication in Loren Z. Clayman's chart that he saw the patient at all prior to surgery.   In fact, he did not.   No ultimate plan was discussed or recorded.

42.     The single preoperative of Elizabeth Michelle Angell taken by Loren Z. Clayman or his staff dated October 6, 2010, is only a frontal view.   Moreover, this frontal view is not in the correct plane to be a true frontal view.   In this photograph, however, she demonstrates severe ptosis (sagging) as well as significant asymmetry in volume and orientation.   There is no record or indication that these conditions were appreciated by Loren Z. Clayman or discussed with the patient at all.

43.     Elizabeth Michelle Angell underwent breast augmentation surgery and liposuction by Loren Z. Clayman on October 6, 2010.   The Operative Report indicates that Loren Z.

Clayman entered the breasts through incision in the areola. Loren Z. Clayman further recorded that the patient "underwent pectoral fashion augmentation." However, neither the Operative Report nor the OR Record provides sufficient detail of the trajectory of dissection used to get access to the lower part of the breast and then into the subpectoral plane.

44.     The Operative Report indicates that Loren Z. Clayman placed 280 cc high profile McGhan saline implants bilaterally. However, the Operative Report does not indicate the amount of saline used to inflate the implants. In fact, Loren Z. Clayman failed to measure the amount of saline used and overfilled both implants. Loren Z. Clayman failed to assess the patient's breasts for symmetry intraoperatively. Liposuction was also performed but not described with any reasonable degree of detail in the Operative Report.

45.     Ms. Angell returned to Loren Z. Clayman's office two days later, on October 8, 2010, for post-operative follow up. She had several questions and complaints:

- "When can I take the hose off?"

- "I NEED DIFLUCEN(sp?) YEAST infection!!! Antibiotic"

- "When do you think I can go back to work?"

- "A lot of stomach/back pain"

- "Can I take my bra off completely to put icepacks over my whole boob?"

The only note for the October 8, 2010 visit stated, "Pt seen today for postop check-up; Pt doing well & will RTO next week." It is unclear who documented this note but there was no discussion of a physical examination by a physician, no real indication how the patient was doing and no record whether the patient's concerns were addressed or even recognized. There is no indication the patient's questions were answered or that she was seen by a physician at all that day.

46. Ms. Angell returned to Loren Z. Clayman's office again on October 13, 2010. Again, she had several questions:

- "knots from lipo"

- "sex"

- "swelling"

- "massaging breast"

- "exercise"

The only note for the visit indicates, "Pt. seen post-op breast and lipo. RTO 1 wk." It is unclear who documented this note but there was no documentation of a physical examination by a physician, no indication how the patient was doing and no record whether the patient's concerns were addressed or even recognized. There was no indication that the patient's questions were answered and, in fact, there is no record in the medical chart that Ms. Angell was even seen by a physician that day.

47. Ms. Angell returned to Loren Z. Clayman's office again on October 22, 2010. She was still having problems with her breasts and indicated that she was there for heat and ultrasound, which had apparently been discussed in the prior visit. The only note for the visit indicates, "Pt underwent ultrasound tx to area on abdomen-8min. RTO next week." It is unclear who documented this note but there is no documentation of a physical examination by a physician, no real indication how the patient was doing and no record of the patient's subjective assessment. In fact, there is no record that Ms. Angell was even seen by a physician that date.

48. Ms. Angell returned on October 26, 2010, November 9, 2010, November 22, 2010, and December 3, 2010 for ultrasound treatment. Very few brief notes were written in the medical chart by unknown authors. There is no documentation of a physical examination by a

11

physician, no indication of how the patient was doing and no record of the patient's subjective assessment.

49.     Ms. Angell returned to Loren Z. Clayman's office again on November 18, 2011. She was very dissatisfied with the appearance of her breasts and was concerned that the breasts were not even and that there seemed to be a displacement of her right breast. She indicated, "right boob comes out of socket/pocket??" The only note for the visit, indicates "follow up visit pt doing well pt. RTO prn." It is unclear who documented this note but there was no documentation of a physical examination by a physician and no real indication of how the patient was doing. There is no description whatsoever of the patient's abnormal condition and no record of a discussion regarding possible alternatives for treatments. No plan of care was discussed or recorded. In fact, there is no record whatsoever that Ms. Angell was even seen by a physician that date.

50.     Ms. Angell did not return to Loren Z. Clayman's office until May 4, 2015. She was still having significant with her right breast as well as her abdomen. The only note for the visit states, "Pt seen today with right breast changing size, recommended bilateral replacement. Pt desires liposuction of abdomen, hips and back. SCH. 6/18/15." It is unclear who documented this note but there is no documentation of a physical examination by a physician and no description of her condition, particularly, the right breast that was of primary concern. There was no detailed record of the patient's subjective assessment or any record of the discussion regarding the condition or possible alternatives or treatment options for the patient. In fact, there was no record that Ms. Angell was even seen by a physician that date. There was a separate surgery cost estimate form that indicated that a revision of the liposuction to her abdomen, hips, and back would be performed for the reduced price of $750.00. In addition, the surgery, cost

estimate form signed by Ms. Angell on April 4, 2014, indicated that she had a "right breast-deflation." It further indicated that she would undergo a bilateral replacement and crescentpexy for no charge to the patient.

51.     Ms. Angell returned for her second surgery on June 5, 2015.   There is no documented physical examination by a physician prior to the surgery.  In fact, Loren Z. Clayman did not see the patient at all prior to surgery.   The History and Physical Form is the only indication in the chart of the patient's goals and objectives or concerns and simply indicates that the, "rt side shifts when laying on one side" and that she wanted the breast "a little fuller." Despite this, Loren Z. Clayman had Ms. Angell sign an Authorization for and Consent to Surgery or Therapeutic procedures which indicated the presence of a right deflation and the need for bilateral replacement as a result.

52.     The Operative Report dated June 5, 2015, indicates the preoperative diagnosis of "right deflation."  However, the preoperative photographs taken by Loren Z. Clayman or his staff on June 5, 2015, due not indicate, or even suggest, the presence of a saline implant deflation. Ms. Angell did not have an implant deflation nor was there any evidence to suggest that she had.

53.     The June 5, 2015, Operative Report indicates that Loren Z. Clayman first entered the right breast and cut into the breast at the areola.  He then dissected down to the right implant and claimed that it was. "found to have deflation approximately 40% (tissue/leak & valve) and removed."  The OR Record further indicated "rt. tissue on and around valve."  The left implant was found intact and removed nonetheless.

54.     Loren Z. Clayman replaced the previous 280 cc high profile saline implants with Allergen Natrelle style 68 moderate profile 300 cc saline implants.  Loren Z. Clayman then merely stated that both implants were then, "inflated to their capacity."  Loren Z. Clayman did

not record the amount of saline infused into either implant. In fact, Loren Z. Clayman failed to measure of saline that were used to fill the implants and overfilled both implants. The OR Record indicates that liposuction was also performed to the abdomen, hips and back. However, the Operative Report, prepared by Loren Z. Clayman failed to indicate the liposuction at all. The entire procedure, including liposuction, only took 46 minutes.

55.     Loren Z. Clayman reported the right implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the implant intraoperatively.[4]   Loren Z. Clayman had Elizabeth Michelle Angell sign the claim form before the surgery was performed, so that Loren Z. Clayman could be paid. Loren Z. Clayman subsequently filed a warranty claim to Allergan for the right implant that he removed on June 5, 2015. In the paperwork he completed and sent to Allergan, Loren Z. Clayman reported that there was a "[h]ole in valve" and/or "[p]articles in valve." [5]   After examining the returned right implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation. Specifically, the Laboratory Analysis found,

> Brown particles were observed on the outer surface of the implant. Brown particles were observed in the filled channel. The particles were removed and valve functioning was then satisfactory.

Despite this, Allergan paid Loren Z. Clayman and Clayman PA the sum of $1,200 for the surgery of June 5, 2015.

56.     On June 11, 2015, Elizabeth Michelle Angell returned to Loren Z. Clayman's office for postoperative follow up. The patient questionnaire does not describe the patient's

---

[4] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) received in Loren Z. Clayman's office via facsimile prior to surgery.
[5] These were the same defects Loren Z. Clayman reported in virtually every warranty claim submitted to Allergan.

subjective assessment. The only note for the visit indicates, "sutures out, taped. R.T.O PRN." The author of this note is unknown but there was no documentation of a physical examination by a physician and no indication how the patient was doing. In fact, there is no record that Ms. Angell was even seen by a physician that day.

57.     Ms. Angell apparently returned again to Loren Z. Clayman's office on July 1, 2015. There is no patient questionnaire and no record of the patient's subjective assessment. The only note for the visit indicates, "Internal clip. R.T.O. P.R.N." The author of this note is unknown and there is no description as to the complication or issue experienced by the patient, the reason for the visit, or a description of the indication. There is no documentation of a physical examination by a physician and no indication of how the patient was doing. In fact, there is no record of the patient even being seen by a physician that date.

58.     After July 1, 2015, Elizabeth Michelle Angell left the care of Clayman Plastic Surgery. After two (2) breasts surgeries at the hands of Loren Z. Clayman, Ms. Angell's breasts and implants remain malpositioned, asymmetrical, painful, and demonstrated a poor aesthetic appearance. She has significant scarring and tissue damage.

59.     On July 22, 2016, Ms. Angell sought a second opinion from Jacksonville Cosmetic Surgery Center, P.A. Her breasts were asymmetric and continued to sag. Silicone implants were recommended.

## COUNT I – CLAYMAN AND ALLERGAN'S CONSPIRACY TO COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

60.     Ms. Angell re-alleges and incorporates by reference paragraphs 1 through 59.

61.     On or before June 12, 2008, Loren Z. Clayman and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty.

62.     Throughout the care and treatment of Ms. Angell, Loren Z. Clayman and/or Clayman PA breached their fiduciary duty to Ms. Angell by:

(a).     Recommending or insisting on Allergan saline implants based on their direct financial motivation rather than making appropriate recommendations based on the best interest of the patient.

(b).     Claiming that her breast implants had deflated when in fact they had not.

(c).     Operating on Ms. Angell on June 5, 2015 based on an alleged implant deflation, which placed her at an increased risk for surgical and anesthetic complications, yet simply repeating the same procedure that was previously performed.

(d).     Not performing the surgery that her physical condition actually required, in favor of surgery that took less time and skill, to allow for the removal and replacement of Allergan Natrelle saline implants.

(e).     Operating on Ms. Angell on June 5, 2015 for an alleged implant deflation so that Loren Z. Clayman and/or Clayman PA could recover a surgical fee from Allergan.

63.     On one or more of the below occasions, Loren Z. Clayman and/or Clayman PA made the following false statements or representations, which were intended to conceal his financial motivation and the financial motivation of Allergan in connection with removal and replacement of allegedly deflated Allergan Natrelle saline implants, and which in fact misled Ms. Brock and/or caused her to respond in the following ways to her detriment:

(a).     On May 4, 2015, Loren Z. Clayman told Ms. Angell that her right breast implant was deflated and needed to be replaced.  In fact, Ms. Angell did not have an implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts.  These representations caused Ms. Angell to

conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Angell did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(b).    In a surgical estimate prepared on May 4, 2015, Loren Z. Clayman represented to Ms. Angell that her right breast implant was deflated and needed to be replaced.  In fact, Ms. Angell did not have a breast implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Angell to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Angell did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(c).    In the informed consent dated June 5, 2015, Loren Z. Clayman represented to Ms. Angell that her right breast implant was deflated and needed to be replaced.  In fact, Ms. Angell did not have a deflation, rupture, or leak of her implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Angell to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Angell did not seek a second

opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(d).     In the Operative Report and OR Record dated June 5, 2015, Loren Z. Clayman represented to Ms. Angell that her right breast implant was deflated and needed to be replaced. In fact, Ms. Angell did not have a deflation, rupture, or leak of her breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Angell to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Angell did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(e).     After the June 5, 2015 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the breast implant removed in the June 5, 2015 surgery indicating a defect of the implant.  By having Ms. Angell sign this claim form Loren Z. Clayman represented to her that her breast implant was leaking and/or defective and needed to be replaced.  In fact, Ms. Angell did not have a deflation, rupture, or leak of her breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Angell to conclude that the problems she was experiencing with her breasts were the result of defective breast implants; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Angell did not seek a

second opinion from another plastic surgeon, , nor did she consult with an attorney about a potential medical negligence claim.

64. Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a). Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the right Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Angell on October 6, 2010, and which Loren Z. Clayman surgically removed on June 5, 2015, despite the following:

(1). Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Angell on October 6, 2010, and explanted from Ms. Angell by Loren Z. Clayman on June 5, 2015, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 5, 2015 surgery was not necessary as a result of a failed breast implant;

(2). Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3). The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(b). Continuing to sell saline filled breast implants to Loren Z. Clayman and/or Clayman PA after June 12, 2008, despite the following:

(1). Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Angell on October 6, 2010, and explanted from Ms. Angell by Loren Z. Clayman on June 5, 2015, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical

intervention," and, thus, that the June 5, 2015 surgery was not necessary as a result of a failed breast implant;

(2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(c).    Failing to report Loren Z. Clayman, and/or Clayman PA to the appropriate authorities after June 12, 2008, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Angell on October 6, 2010, and explanted from Ms. Angell by Loren Z. Clayman on June 5, 2015, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 5, 2015 surgery was not necessary as a result of a failed breast implant;

(2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(d).    After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Angell, failing to conduct an appropriate and timely investigation into the cause of the reported

failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

(e). After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Angell, failing to report to the FDA or other authorities, in a substantially complete form and timely manner, each failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

65. As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Angell suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

66. Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Angell has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ELIZABETH MICHELLE ANGELL**, demands judgment for damages against the Defendant, **ALLERGAN SALES, LLC,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT II – ALLERGAN AIDING AND ABETTING FRAUD
## AND/OR BREACH OF FIDUCIARY DUTY

67.     Ms. Angell re-alleges and incorporates by reference paragraphs 1 through 59, 62 and 63.

68.     Allergan, through its employees or agents, knew that Loren Z. Clayman and/or Clayman PA, was committing fraud upon Ms. Angell, and/or breaching a fiduciary duty owed to Ms. Angell, due to the following:

> (a).     Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Angell on October 6, 2010, and explanted from Ms. Angell by Loren Z. Clayman on June 5, 2015, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the June 5, 2015 surgery was not necessary as a result of a failed breast implant;

> (b).     Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

> (c).     The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

69.     Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman and/or Clayman PA in committing fraud against Ms. Angell, and/or breaching a fiduciary duty owed to Ms. Angell, in either or both of the following ways:

(a).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the right Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Angell on October 6, 2010, and which Loren Z. Clayman surgically removed on June 5, 2015.

(b).    Continuing to sell saline filled breast implants to Loren Z. Clayman, and/or Clayman PA after June 12, 2008; and/or

(c).    Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate authorities after June 12, 2008.

(d).    After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Angell, failing to conduct an appropriate and timely investigation into the cause of the reported failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations; and/or

(e).    After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Angell, failing to report to the FDA in a substantially complete form and timely manner each failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

70.    As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Angell suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

71.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Angell has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ELIZABETH MICHELLE ANGELL**, demands judgment for damages against the Defendant, **ALLERGAN SALES, LLC,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – CONSORTIUM CLAIM

72.    Mr. Angell re-alleges and incorporates by reference paragraphs 1 through 59.

73.    Mr. Angell was and is the lawful wedded husband of Ms. Angell, and did and does reside with her.

74.    As a direct and proximate result of the above described wrongful conduct of the Clayman Defendants and Allergan, Mr. Angell has lost the care, comfort, and companionship of Ms. Angell, and he will suffer these losses in the future.

WHEREFORE, the Plaintiff **BRETT ANGELL** demands judgment for damages against the Defendant, **ALLERGAN SALES, LLC,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:    (904) 632-2424
Facsimile:    (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: aashley@terrellhogan.com

Florida Bar No.: 0947865
Attorney for the Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of April, 2018, a true and correct copy of the foregoing has been filed thorugh the Court's CM/ECF case management system, which will serve a notice of electronic filing to **Jennifer M. Voss, Esquire**, Shook, Hardy & Bacon LLP, 100 North Tampa Street, Suite 2900, Tampa, FL   33602-5810 (jvoss@shb.com; bguthrie@shb.com).

/s/ Christopher N. Shakib